```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
```
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| RANDALL MILLER, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>LEEROY HARDIN and )<br>BOYLE COUNTY FISCAL COURT )<br>)<br>    Defendants. ) | Civil Action No. 09-CV-09-JMH<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

              \*\*    \*\*    \*\*    \*\*    \*\*

This matter is before the Court on Defendants' motion for summary judgment [Record No. 14]. The plaintiff has responded, Defendants have replied, and this matter is now ripe for decision.

**I.    INTRODUCTION**

Plaintiff Randall Miller ("Miller") brings two claims against Defendants Leeroy Hardin, Marty Elliot, and the Boyle County Fiscal Court ("Defendants").[1] The first claim is for violations of the Family and Medical Leave Act ("FMLA"). Specifically, Miller avers that Defendants interfered with his rights under the FMLA. The second cause of action alleges that Defendants mistakenly believed that Miller had a physical disability and fired him because of that disability, in violation of KRS 344.040, the Kentucky Civil Rights Act. Miller claims damages for lost wages, future earnings, interest, lost employment benefits, emotional distress, mental anguish, pain and suffering and seeks to be reinstated to his

---

[1] Leeroy Hardin is the former Boyle County Sheriff, and was the sheriff at the time of the events which are the subject of this lawsuit. Marty Elliot is the current Boyle County Sheriff.

former position and recover attorney's fees.

Defendants moved for summary judgment on the grounds that Miller did not follow the statutory procedures for instituting FMLA-qualifying leave, that he was terminated because regardless of his leave status he would not be able to continue to perform his job duties, and that Defendants could not have violated the Kentucky Civil Rights Act because they did not regard Miller as disabled.

For the reasons stated herein, Defendants' motion for summary judgment is denied.

## II. FACTUAL BACKGROUND

Miller began employment with the Boyle County Fiscal Court on August 5, 2005, as a Deputy Sheriff. Prior to his employment with the Boyle County Fiscal Court, Miller served as a Junction City Police Officer for approximately five years.

In 2007, Miller began having severe headaches which caused him to miss work occasionally. Over the course of 2007 and 2008, Miller's condition worsened and he began to experience what he describes as "blackout spells." [Resp. Mot. Summ. J. 3, Record No. 19.] On August 29, 2008, Miller invited Chief Deputy Jimmy Wilcher to his home and discussed (for the first time) his condition, including his blackout spells, with Wilcher. Miller told Wilcher that he needed to take time off to see a doctor. Wilcher approved this request for time off.

2

In the days that followed, Miller met with Dr. Maria Pavez, a neurologist, to discuss his headaches and blackout spells. Dr. Pavez ordered Miller off work beginning September 2, 2008 and restricted his driving. [Pavez Dep. 17, Record No. 23.] Dr. Pavez recommended Miller have a neurological evaluation at the University of Kentucky epilepsy center, which he did soon after his visit with Dr. Pavez. [Miller Dep. 101, Record No. 20.] After this evaluation, the doctors informed Miller that he was not having seizures, but was having "psychogenic seizures" or "pseudoseizures," which were stress-induced. [Miller Dep. 109-10, Record No. 20.] As a result, Miller sought treatment from Dr. Piotr Zieba, a psychiatrist, and Dr. Noble, a psychologist, in an effort to alleviate some of his stress and stress-induced symptoms. Drs. Zieba and Pavez prescribed medications for Miller during this time as well.

On October 25, 2008, Miller and Sheriff Hardin had a meeting to discuss Miller's condition. Miller told Hardin that he was not suffering from seizures but that he had "spells" and migraine headaches. Miller informed Hardin that although he had been under a driving restriction, his diagnosis after visiting the epilepsy center reflected that he was not having seizures. He was not sure whether Dr. Pavez would lift the driving restriction, but he had an appointment to see her in the near future. [Miller Dep. 120, Record No. 20.] Miller explained that his "spells" caused him to lose

focus to the point that he could not see or hear anything during the duration of the blackout spell and suffered memory loss after the blackout spell. [Miller Dep. 121, Record No. 20 and Hardin Dep. 19, Record No. 21.] At that meeting, Hardin asked Miller to fill out and turn in the FMLA paperwork.[2] Miller responded that he would be able to do so soon, because he was seeing Dr. Pavez for a follow-up appointment in a few days. [Miller Dep. 123, Record No. 20.]

At his appointment with Dr. Pavez on October 28, 2008, Dr. Pavez provided Miller with a note addressed, "To Whom it May Concern," stating that Miller was her patient, that he was still being evaluated, and that he was to remain off work. [Pavez Dep. 29-30, Record No. 23.] Miller also received a note from Dr. Zieba on October 28, 2008, recommending that Miller remain on leave from work until December 1, 2008.

There exists some dispute as to whether anyone at the Boyle County Fiscal Court received these notes prior to October 31, 2008. On that day, Hardin called Miller to come to his office for a meeting. At that meeting, Hardin explained that he thought Miller would be a liability to the county if Miller returned to his former position as a deputy sheriff, particularly because a large

---

[2] Although the facts are not entirely clear, it appears that Connie Smith from Boyle County Fiscal Court provided Miller's wife (who works in the same building) with FMLA paperwork sometime prior to October 25, 2008, and asked that it be completed and returned.

component of that position involved operating a police cruiser, which Hardin felt could not be done safely with Miller's history of blackout spells. Hardin provided Miller the opportunity to resign but stated that, if he did not resign, Hardin would terminate him.

Miller did not immediately resign, nor was he terminated at the conclusion of that meeting. On November 6, 2008, Miller returned for appointments with both Drs. Pavez and Zieba. At these appointments, Miller asked both doctors if he could be cleared to return to work, "thinking if his doctors would clear him, maybe Sheriff Hardin would change his mind about firing him." [Resp. Mot. Summ. J. 7, Record No. 19.] Both doctors stated they would clear him to return to work if the other concurred. Thus, Miller was cleared to return to work, without restrictions, on November 6, 2008, despite the fact that the same two doctors recommended, only a few days earlier, that Miller remain off work for an extended period of time. The following day, Miller provided the notes releasing him to work to Hardin. Hardin said he would think about the situation and call Miller later that evening. In the interim, Hardin telephoned Dr. Zieba to inquire about the note Dr. Zieba provided Miller, releasing Miller to work without restrictions. Dr. Zieba stated that yes, he did release Miller to work without restrictions, but that he could not guarantee that Miller would not suffer another blackout spell or other symptom. Dr. Zieba advised Hardin to contact Dr. Pavez for information regarding Miller's

neurological condition. Hardin did not contact Dr. Pavez for additional information.

Hardin called Miller the evening of November 6, 2008 and stated that he felt that Miller had been dishonest with him regarding his condition. Hardin stated that he felt Miller had been dishonest because Miller did not disclose his blackout spells to him (which he felt were a danger to the public, due to Miller's job responsibilities) until long after they began, and because Miller asked to be off work until sometime in December 2008 or January 2009 and provided doctors' notes to that effect, but when threatened with loss of his job, provided doctors' notes stating that he (Miller) could return to work immediately, in early November. As a result, Hardin informed Miller that he was terminated, effective immediately.

Miller subsequently filed this action for violations of his rights under FMLA and KRS 344.040. Miller alleges that he was terminated for an FMLA-related reason while on FMLA leave, in bad faith and in violation of the statute, and suffered damages therefrom. Miller also avers that Defendants mistakenly believed that he was disabled and fired him under this mistaken belief of Miller's disability in violation of KRS 344.040.

### III. STANDARD

Summary judgment is appropriate when "there is no issue as to any material fact, and . . . the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party "cannot rest on its pleadings, but must identify specific facts supported by affidavits, or by depositions, answers to interrogatories, and admissions on file that show there is a genuine issue for trial." *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir. 1997). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In considering a motion for summary judgment, the Court must construe the facts in the light most favorable to the nonmoving party. *Id*. at 255.

**IV. DISCUSSION**

    **A. FMLA CLAIM**

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.,* 424 F.3d 481, 485 (6th Cir. 2005)(quoting 29 U.S.C. § 2612(a)(1)(D)). An employer may not "interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Employers who violate

7

FMLA are liable to the affected employee for damages and equitable relief. *Walton v. Ford Motor Co.*, 424 F.3d at 485.

In order for leave to qualify under the FMLA, the employee and employer must satisfy specific procedures under the FMLA regulations. These procedures dictate when the employee's FMLA-qualifying leave commences and ends. In this case, Miller and Defendants each accuse the other party of failing to follow the proper procedures under the FMLA. Each of these arguments is addressed below, in the order in which each party was supposed to act under the FMLA.

### A. Miller's obligation to put Defendants on notice of a serious health condition.

Defendants argue that Miller failed to provide Defendants with sufficient notice of his serious health condition to invoke the protections of the FMLA. Employees are required to provide their employers with thirty days advance notice before the FMLA is to begin, if the leave is foreseeable, and if it is not foreseeable, an employee must notify the employer as soon as practicable. 29 CFR § 825.302. As Defendants correctly state, "the employee does not have to explicitly mention the FMLA by name, 'the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" [Mot. Summ. J. 9, quoting *Brohm v. JH Properties*, Inc., 149 F.3d 517, 523 (6th Cir. 1998).] Defendants do not argue that Miller should have provided

8

them with thirty days' advance notice of his leave. Defendants simply argue that the notice Miller did provide was insufficient to put them on notice that Miller was invoking the protections of the FMLA.

Defendants state that on August 29, 2008, Miller called Chief Deputy Wilcher (then acting Sheriff during Sheriff Hardin's absence) to his home and explained that he was having a variety of health problems which would require time away from work. Miller described his symptoms to Wilcher as "headaches" and "blackout spells." Wilcher instructed Miller to take off as much time as he needed to take care of his health issues. [Wilcher Dep. 7, Record No. 22.] This interaction was more than "sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Brohm v. JH Properties*, Inc., 149 F.3d at 523. Defendants clearly considered Miller's headaches and blackout spells to be a serious condition, as is evidenced by Wilcher's instructions to Miller during the August 29, 2008 meeting to take off as much time as he needed. Wilcher described Miller as "crying" and "out of control" at that meeting. [Wilcher Dep. 6, Record No. 22.] In addition to telling Miller to take off as much time as he needed, Wilcher observed Miller's condition and opined, "you can't work the way you are." [Id. at 7.] Therefore, the Court finds that a genuine issue of material fact exists as to whether Miller provided Defendants with sufficient notice of his intention

to take leave for a serious health condition on August 29, 2008 and summary judgment on this ground is inappropriate.

### B) Miller's ability to return to work

Miller avers that his termination interfered with the exercise of his rights under the FMLA. Defendants argue that they did not terminate Miller because he exercised his FMLA rights, but because he was completely unable to return to his former position as deputy sheriff. To prevail on an "interference," or, as it is sometimes called, an "entitlement" claim under the FMLA,

> an employee must prove that (1) [he] was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) [he] was entitled to leave under the FMLA, (4) [he] gave the employer notice of [his] intention to take leave, and (5) the employer denied the employee FMLA benefits to which [he] was entitled.

*Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). "If an employer interferes with the FMLA-created right . . . to reinstatement following the leave, a violation has occurred." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). There is no dispute as to the first two elements of Miller's entitlement claim. The third element is in dispute, and depends, in part, on the fourth element. The fourth element of the claim, whether Miller gave Defendants sufficient notice of his intention to take leave, is discussed above in section A. If Miller can prove the third and fourth elements, he will still have to prove that Defendants denied him FMLA benefits to which he was entitled, namely, the return to his former position at the conclusion of his

10

leave. The question in this inquiry focuses on what benefits Miller was entitled to under the FMLA and whether Defendants deprived him of these benefits, not on Defendants' intentions or motivations (such as retaliation) in taking certain actions against Miller.

Miller's position as deputy sheriff required that he carry a firearm, operate a police cruiser, and perform his duties under extremely stressful conditions when necessary. [Hardin Dep., Ex. 1, Record No. 21.] It is undisputed that Miller described his condition to Defendants as including "blackouts" and that Miller's treating physicians had concerns regarding Miller's ability to operate a vehicle and firearm safely. [Miller Dep. 98, Record No. 20; Pavez Dep. 17, Record No. 23; and Zieba Dep. 21, Record No. 24.] On October 31, 2008, Sheriff Hardin told Miller that he could resign or Hardin would fire him, based on the fact that Miller was experiencing "blackout spells" and Hardin felt it was a danger to the community to allow Miller to operate a police cruiser if he was experiencing those symptoms. It is not clear from the record why Hardin decided that the sheriff's department should not longer employ Miller at that time, but there is evidence in the record that 1) Miller's paid sick and vacation time was exhausted on or around October 26, 2008; 2) on October 28, 2008, Defendants received a letter from Dr. Zieba, his psychiatrist, stating that Miller needed leave from work until December 1, 2008; and 3) on

11

October 28, 2008, Defendants received a letter from Miller's neurologist, Dr. Pavez, discussing Miller's condition.

Defendants argue that by the virtue of receiving these two letters, and Hardin's discussion with Miller on October 31, 2008, "by October 31, 2008, when Sheriff Hardin asked Miller to resign, it was readily apparent to him that Miller was not going to be able to resume his duties as a Deputy Sheriff." [Mot. Summ. J. 17, Record No. 14.]

Additionally, on October 28, 2008, Miller obtained the FMLA medical certification from his neurologist, Dr. Pavez. Miller and Defendants dispute when Defendants received this certification, whether on October 28, 2008 or on November 3, 2008. For the purposes of summary judgment, the Court resolves factual disputes in favor of the non-moving party, and, thus, will assume that Defendants received the medical certification form on October 28, 2008, the date Miller claims they received it.

The medical certification form states that Miller, as of October 28, 2008, was "currently incapacitated," that the duration of his incapacity was "unknown," that he was suffering from a "chronic condition," resulting in "atypical spells," and that Miller was "unable to drive or return to work at [that] time." [Hardin Dep., Ex. 7, Record No. 21.]

Defendants correctly note that the Sixth Circuit Court of Appeals has "held that an employer does not violate the FMLA when

12

it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." *Edgar v. JAC Products, Inc.*, 443 F.3d at 506-7(citing *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784-85 (6th Cir. 1998)). That Court has further stated that

> the right to non-interference with medical leave also is not absolute. "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998). An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave. *Id.*

*Arban v. West Pub. Corp.*, 345 F.3d at 401.

When Hardin actually fired Miller on November 7, 2008, Hardin had recently received two letters from Drs. Pavez and Zieba, written in late October, stating that Miller was unable to return to work until at least December 1, 2008 and a medical certification from Dr. Pavez, also completed in late October 2008, stating that Miller was not supposed to drive for an undetermined amount of time. Yet, Hardin had also received two additional letters from Drs. Pavez and Zieba, just days after the first two letters, which stated that Miller had requested to be released to return to work, and that each physician was releasing Hardin to work, without restrictions, contingent upon the other physician's concurrence. Hardin was understandably concerned about the fact that Miller's

13

doctors had suddenly released him for work only days after stating that he was unable to drive and should remain on leave from work for at least an additional month. Defendants argue that the letters releasing Miller to work "contradict everything Miller's doctors had been reporting over the course of two and a half months of treatment" and should be afforded "no weight since they were written at the request of Defendant [sic] after he was asked to resign or be terminated." [Mot. Summ. J. 17, Record No. 14.]

If Defendants can show that they would have terminated Miller "for reasons not related to his . . . FMLA request" then Miller cannot prevail on the fifth element of his entitlement claim. Hardin testified that he dismissed Miller for being "insubordinate" and because Dr. Zieba, though he had released Miller to work without restrictions, told Hardin he could not guarantee that Miller would not suffer another blackout spell. [Hardin Dep. 38 and 51-52, Record No. 21.]

The undersigned finds, however, that Drs. Pavez and Zieba's letters releasing Miller to work without restrictions on November 6, 2008, create a genuine issue of material fact as to whether Miller could return to his former position.[3] If Miller was "indisputably unable to return to work at the conclusion of the 12-week period of statutory leave" then *Edgar* and *Cehrs* apply, and,

---

[3] Defendants and Miller agree that there was never a serious proposal or discussion from either party regarding Miller coming back to work in a position other than deputy sheriff.

thus, Miller was not entitled to the FMLA benefit Defendants deprived him of, namely, reinstatement to his former position. *Edgar v. JAC Products, Inc.*, 443 F.3d at 506-7 (citing *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784-85 (6th Cir. 1998)). If Miller was able to return to work and Defendants denied him this benefit, then Miller can satisfy the fifth element of an entitlement claim. This is a fact question which is appropriate for the jury, thus, summary judgment must be denied.

**2) Kentucky Civil Rights Act Claim**

> In order to establish a prima facie case of discrimination based on a disability, the plaintiff must show: (1) that he had a disability as that term is used under the statute (i.e., the Kentucky Civil Rights Act in this case); (2) that he was "otherwise qualified" to perform the requirements of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability.

*Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706-7 (Ky. Ct. App. 2004).

The second element of the claim depends on whether or not Miller could perform his job. This inquiry will be very similar to that addressed above, in section B. The notes from Miller's doctors releasing him to work without restrictions tend to prove that Miller was qualified to perform the requirements of his former job, and, thus, Miller can satisfy this element. There is also ample evidence in the record that Miller's blackout spells were at least part of the reason that Hardin initially asked Miller to

15

resign or be fired, satisfying the third element of the claim.

The primary dispute here is whether Miller can prove the first element of the claim. Miller alleges that Defendants discriminated against him by terminating his employment, in violation of KRS 344.010-40, based on their mistaken belief that he was disabled. KRS 344.010 defines "disability" as "(a) [a] physical or mental impairment that substantially limits one (1) or more of the major life activities of the individual; (b) [a] record of such an impairment; or (c) [b]eing regarded as having such an impairment." KRS 344.010. Miller argues that Defendants "regarded" him "as having such an impairment," even though he did not suffer from a disability, and discriminated against him based on that mistaken belief of disability. For Miller to succeed on this claim, he must demonstrate that Defendants thought he had a disability which would prevent him from performing a broad class of jobs. *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 594 (Ky. 2003).

KRS 344 was modeled after federal law and has been interpreted consistently with the federal Americans with Disabilities Act (ADA). *Id.* The Sixth Circuit has interpreted the "regarded as" claim under the ADA to mean that "'(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.' *Henderson*

16

*v. Ardco, Inc.,* 247 F.3d 645, 650 (6th Cir. 2001) (quoting *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999)). Defendants argue that they were not mistaken about the fact that Miller had a physical or mental impairment but that his impairment did not substantially limit one or more of his major life activities. Thus, Defendants and Miller purport to agree, at least at this time, that Miller was not suffering from any impairment that substantially limited a major life activity. Miller claims, however, that he had no mental or physical impairment at all, while Defendants argue that Miller did have a mental or physical impairment, but that that impairment did not rise to the level of limiting a major life activity. Defendants argue that Miller's impairment only limited his ability to perform some of his particular, essential duties as a deputy sheriff, such as operating a vehicle, but did not limit Miller's ability to perform a broad class of jobs. *See Howard Baer, Inc. v. Schave*, 127 S.W.3d at 594.

In response, Miller argues that Hardin's own deposition testimony supports a finding that Defendants believed that Miller's condition substantially limited a major life activity. The ADA includes "concentrating" as a "major life activity" for the purpose of defining "disability" under the Act. Miller argues that because Hardin admitted at his deposition that he believed that Miller suffered from a loss of concentration, Hardin was under the mistaken belief that Miller suffered from a an impairment (blackout

17

spells and headaches), which substantially limited his ability to concentrate, a major life activity as defined in the ADA, and consequently, KRS 344. [Resp. Mot. Summ. J. 17, Record No. 19.] Hardin's testimony was as follows:

> with what he had told me prior to the prior meeting with him losing his concentration . . . and I just think it put him at risk, and, just like I said before, it put the people at risk. You know, I'm putting him out there in cruiser. I'm putting him out there with a gun.

[Hardin Dep. 24, Record No. 21.] Hardin clearly believed that Miller's loss of concentration would seriously and dangerously interfere with essential aspects of Miller's job duties, such as using a firearm and operating a vehicle, but Hardin's testimony is ambiguous as to whether he believed that the Miller's physical or mental impairment (blackout spells) significantly limited Miller's ability to "work in a broad class of jobs," not simply Miller's job as deputy sheriff. *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001). At the summary judgment stage, however, "all inferences must be made in favor of the non-moving party." *Id.* A question of what Defendants thought or believed is a question of Defendants' "state of mind that is more appropriate for the jury than for the judge." *Id.* The Court must refrain from drawing a conclusion "from the evidence that should be left to the jury." *Id.* Thus, summary judgment on this claim must be denied.

V. **CONCLUSION**

Accordingly, for the reasons stated herein, **IT IS ORDERED** that

18

Defendants' motion for summary judgment [Record No. 14], be, and the same hereby is, **DENIED**.

This the 9th day of April, 2010.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge